Timothy Devlin
Lowell D. Jacobson (*pro hac vice* forthcoming)
Clifford Chad Henson (TX Bar No. 24087711)
**DEVLIN LAW FIRM, LLC**
1526 Gilpin Avenue
Wilmington, Delaware 19806
Tel: (302) 449-9010   Fax: (302) 353-4251

*Attorneys for Plaintiff Happy Products, Inc.*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| HAPPY PRODUCTS, INC., <br><br>         Plaintiff, <br><br>   v. <br><br> THE KROGER COMPANY, <br><br>         Defendant. | Civil Action No. <br><br> **COMPLAINT FOR PATENT INFRINGEMENT, TRADE DRESS INFRINGEMENT, AND UNFAIR COMPETITION** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Happy Products, Inc. ("Plaintiff" or "HPI"), by and through its undersigned counsel, files this complaint against Defendant The Kroger Company ("Kroger" or "Defendant") and alleges as follows:

**NATURE OF THE ACTION**

1.  This action arises under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq.*, the federal Lanham Act, 15 U.S.C. §§ 1051, *et seq.*, and Tex. Bus. & Com. Code §§ 16.29 and 16.103, for acts relating to Defendant's sale, offer for sale, marketing, advertising, and use in the United States of the Pillow Pad or Pill-O-Pad media support device (hereinafter, "Pillow Pad") supplied by non-party Ontel Products Corporation ("Ontel").  Pillow Pad is a knock-off copy of HPI's visually distinct and patented Flippy® or Flipy ® tablet pillow stand (hereinafter, "Flippy") that has been distributed throughout the United States online and at virtually all major

retailers (including but not limited to Defendant), and used to sell other and inferior media

support products, to the detriment of consumers and Plaintiff HPI.

    2.    Shown below are HPI's Flippy (left) and Ontel's knock-off Pillow Pad product

(right) that was sold by Defendant.  As shown in the diagram below them, the Flippy and the

Pillow Pad each provide three different viewing angles for a supported media.  Each of the three

viewing angles is obtained by flipping the device to rest upon each of its three sides.



    3.    By virtue of this action, HPI seeks monetary damages and a preliminary and/or

permanent injunction that prohibits Defendant and its principals from marketing, advertising,

selling and/or offering to sell the knock-off Pillow Pad product (including any substantially

similar product, whether or not so marked) in the United States, and further prohibits Defendant

and its principals from assisting any other entity in importing, making, using, distributing,

marketing, advertising, selling or offering to sell the knock-off Pillow Pad product (including

any substantially similar product, whether or not so marked) into or in the United States.

            HPI V. KROGER COMPLAINT

## THE PARTIES

4.     Plaintiff Happy Products, Inc. ("HPI") is a small woman-owned business that invented, developed, and continues to market and sell the Flippy.

5.     Happy Products, Inc. is a Delaware corporation located in Portland, Oregon.

6.     On information and belief, Defendant The Kroger Company ("Kroger"), is an Ohio corporation with its principal place of business at 1014 Vine Street, Cincinnati, Ohio, 45202.

## OTHER RELEVANT ENTITIES

7.     On information and belief, non-party Ontel was founded by Ashok (aka "Chuck") Khubani in 1994, and offers "As Seen on TV" products including the Pillow Pad, which is indicated at www.asseenontvlive.com/best-sellers/ to be a "best seller."

8.     On information and belief, Ontel is a New Jersey corporation with its principal place of business at 21 Law Drive, Fairfield, New Jersey, 07004.

9.     On information and belief, Chuck Khubani was personally and directly involved in all aspects of the business of Ontel during at least the 2018–2019 period and through approximately summer of 2022.

10.     On information and belief, non-party Telebrands Corporation was founded by Ajit (aka "AJ") Khubani and, having created the "As Seen on TV" brand, offers "As Seen on TV" products.

11.     On information and belief, Telebrands is a New Jersey corporation with its principal place of business at 79 Two Bridges Road, Fairfield, New Jersey, 07004.

12.     AJ Khubani is the CEO of Telebrands and is a resident of New Jersey.

13.     On information and belief, AJ Khubani is personally and directly involved in all aspects of the business of Telebrands.

14.     Chuck Khubani and AJ Khubani are brothers.

HPI V. KROGER COMPLAINT

## JURISDICTION AND VENUE

15.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, and 1338(a)–(b) under the patent laws of the United States, 35 U.S.C. §§ 100, *et seq.*, and the Lanham Act, 15 U.S.C. §§ 1051, 1121.  This Court also has subject matter over this action pursuant to 28 U.S.C. § 1367(a) for the claims arising under Texas common law.

16.     This Court has personal jurisdiction over Defendant in accordance with due process and/or the Texas Long Arm Statute because, among other activities, Defendant conducts business in this state directly and/or through operating companies that have conducted and continue to conduct business in this judicial district, and has engaged in activities related to Plaintiff's claims that establish minimum contacts with the state of Texas, including having committed acts of patent infringement, trade dress infringement, and unfair competition in this district.

17.     On information and belief, this court has personal jurisdiction over Kroger based on its continuous and systematic activities in the Eastern District of Texas at its numerous store locations, which include but are not limited to the store location at 1820 N Loy Lake Road, Sherman, TX 75090.

18.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b) because Kroger has a regular and established place of business in this District at the aforementioned location and, on information and belief, has committed acts of patent infringement in this District and because a substantial part of the events or omissions giving rise to the claims against Kroger occurred in this District.  On information and belief, Kroger has committed acts of patent infringement in this District at least at the aforementioned location, and by selling and offering for sale from its website to residents of this District Ontel's knock-off Pillow Pad product ,

HPI V. KROGER COMPLAINT

## THE BUSINESS AND BUSINESS MODEL OF ONTEL AND TELEBRANDS

19.     On information and belief, Ontel Products Corporation was founded by Ashok (aka "Chuck") Khubani in 1994, and offers "As Seen on TV" products including the Pillow Pad, which is indicated at www.asseenontvlive.com/best-sellers/ to be a "best seller."

20.     On information and belief, Telebrands Corporation was founded by Ajit (aka "AJ") Khubani and, having created the "As Seen on TV" brand, offers "As Seen on TV" products.

21.     Ontel and Telebrands are each infamous for a pattern of copying successful proprietary products and seeking to piggyback on the innovations of others by selling "knock-off" products (often made in China), which are then imported into the United States.

22.     As alleged in an infringement lawsuit filed against Telebrands by MyPillow, "the principal of Telebrands, AJ Khubani, is known as the infamous 'Knock Off King' of the infomercial industry."

23.     Ontel and Telebrands each promote and offer for sale products online and through national direct response television commercials (aka "infomercials").

24.     Each of Ontel and Telebrands is a big player in the direct response industry and a well-known marketer of "As Seen On TV" products.[1]

---

[1]        See        https://www.asseenontvlive.com/brands/telebrands        and https://www.asseenontvlive.com/brands/ontel .

HPI V. KROGER COMPLAINT



25.     On information and belief, "As Seen on TV" is a brand used to identify products that are or were advertised and offered on direct response TV—i.e., via infomercials.

26.     Because of their superior size, market penetration, and retail connections, Ontel and Telebrands are able to quickly generate advertising and commercials to aggressively market "knock-off" products, which they sell directly and through various retail partners.

27.     On information and belief, it is a standard business practice for each of Ontel and Telebrands, with the substantial involvement of their respective CEOs, to intentionally "test the market" to determine whether sufficient sales can be generated to justify the manufacturing and marketing of products.

28.     This was explained in a 2007 article in New York Magazine about Telebrands, which stated:

> The hard part, in fact, is accurately predicting demand, which Khubani's test-launches sometimes fail to do. To roll out five new items, as Khubani will do this year, he'll film infomercials for at least twenty and try each one out for a week. Each trial needs to generate double its advertising costs to make it to a full launch, which involves buying millions of dollars in national advertising time and ordering between a half-million and a million pieces.

See https://nymag.com/news/features/31806/ .

29.     Ontel and Telebrands each also markets and sells products at the retail level through well-known retailers, including Defendant.  For Ontel, these retailers have included

Amazon, Target Stores, BJ's Wholesale Club, Boscov's, Kroger (and various other brands operated by Kroger and most of its sub-brands, including but not limited to Fred Meyer), Meijer, Big Lots, Ollie's Bargain Outlets, Walmart, Ace Hardware, Rite Aid, the JoAnn Stores, Lowe's, Bed Bath & Beyond, CVS, and Walgreens.

30.     Ontel's business model is straightforward: it typically identifies a successful pioneering product, has knock-off copies manufactured (often in China), and then imports the knock-off products into the United States for sale (both directly and through retail partners) at a substantially lower price than the pioneering product.

31.     On information and belief, Ontel seeks to free-ride on the success of pioneering products by undercutting them in the market, selling them at discounted prices relative to the original pioneering product.

32.     Ontel typically makes little (if any) effort to meaningfully distinguish its knock-off products from the pioneering products being copied.

33.     Rather, on information and belief, Ontel deliberately seeks to blur the lines between its knock-off products and the pioneering products being copied.

34.     The design of such knock-off products is normally substantially similar, if not identical, to the pioneering product being copied.

35.     Ontel's knock-off products are typically of inferior quality to the pioneering product being copied.

36.     Ontel's knock-off products being of inferior quality to the pioneering product being copied is a substantial reason why Ontel is able to offer its knock-off products at a lower price and undercut the pricing of the pioneering product being copied.

37.     Ontel's efforts to blur the lines between its knock-off products and the pioneering products are not just limited to knocking-off the design of the pioneering product being copied.

38.     Ontel also seeks to knock-off the advertising and marketing of the pioneering product being copied, including copying or emulating the messaging, images, and/or terminology used to advertise and market the pioneering product.

HPI V. KROGER COMPLAINT

39.    Ontel's marketing for its knock-off products is typically substantially similar to that of the pioneering product being copied.

40.    Ontel is aware that this business model invites litigation in response.

41.    Many of the pioneering products targeted by Ontel are provided by small companies without substantial resources to litigate.

42.    The lack of resources of the typical companies behind the pioneering products targeted for copying by Ontel reduces the risk that lawsuits will be brought against Ontel for infringement of the targeted companies' intellectual property.

43.    Nevertheless, over the past quarter-century, Ontel has been repeatedly sued in the United States for such conduct, including tens of claims for each of trademark and/or trade dress infringement, patent infringement, and copyright infringement.

44.    The products copied by Ontel in such fashion include (but are not limited to) "the Perfect Push-Up," the "Pocket Hose", the "Pet-Rider," the "Guidelight" and the "SnapPower Charger," the "Sure Clip," the "Cami Secret," the "Firminator," ThinOptics reading glasses and attachable smartphone case, and the "Hair Master"—all of which are products covered by patents, copyrights, and/or trademarks.

45.    Ontel's approach has been described in detail in numerous other lawsuits, including (but not limited to) in paragraphs 48–54 of the complaint (Dkt. 1) in *KNR Indus. v. Ontel Prods.*, No. 2:04-cv-74055-JF-DAS (E.D. Mich., Oct. 18, 2004).

46.    Telebrands is also aware that its knock-off business model invites litigation in response.

47.    Many of the pioneering products targeted by Telebrands are provided by small companies without substantial resources to litigate.

48.    The lack of resources of the typical companies behind the pioneering products targeted for copying by Telebrands reduces the risk that lawsuits will be brought against Telebrands for infringement of the targeted companies' intellectual property.

HPI V. KROGER COMPLAINT

49.     Nevertheless, over the past quarter-century, Telebrands has been repeatedly sued in the United States for such conduct, including tens of claims for each of trademark and/or trade dress infringement, patent infringement, and copyright infringement.

50.     In the 2007 New York Magazine article (see ¶ 52, above), when confronted with a charge that Telebrands copied the advertisement of a competing product frame-by-frame, AJ Khubani responded that he "didn't steal the idea from them" and claimed that "people are always borrowing in business.  The first person that came up with the laptop—how many times were they copied?  The first person who came up with the minivan?"

51.     AJ Khubani's own LinkedIn profile promotes "his" incredible success with the PedEgg and Pocket Hose products even though Telebrands and/or its distributors were sued for patent infringement for each of those products by Grace Manufacturing and Ragner Technology Corp., respectively.

52.     Ontel and Telebrands each employ aggressive bullying tactics in response to the potential of adverse litigation when these smaller companies attempt to assert their intellectual property rights against the respective Ontel and Telebrands knock-offs that saturate the market.

53.     Even so, according to a 2023 CBS News investigative report, Ontel and Telebrands have collectively faced over 100 lawsuits for intellectual property infringement.

54.     On information and belief, approximately 80% of these lawsuits have ended via settlement.

55.     On information and belief, Ontel and Telebrands typically condition their settlements upon the plaintiffs agreeing to strict non-disclosure agreements (NDAs) to prevent negative publicity and avoid further public attention on their knock-off business model, flagrant disrespect for innovators' intellectual property rights, unfair competition, and bullying and aggressive tactics.  This prevents these plaintiffs from publicly discussing the damage caused to their companies and IP by Ontel and Telebrands.

56.     At least in part because of the NDAs quashing public communication about the pattern of theft of smaller company IP by each of Ontel and Telebrands, they have each been

HPI V. KROGER COMPLAINT

able to continue their respective knock-off product business models and thrive over the past decades.

**THE PATENTED MEDIA SUPPORT**

57.    U.S. Patent No. 9,642,454 ("the '454 patent"), entitled "Multiple Viewing Angle Media Support," was duly issued to inventors Bruce Cannon and Juliette Fassett.

58.    The '454 patent describes a media support apparatus that includes three support sides (155) that can be disposed about a central axis (125), each side having a support back (105) and support edge (110), where the top of each back support is in physical communication with the edge support of another side, as shown in Figure 1 (included below).



FIG. 1

59.    The application that eventually matured into the '454 patent was filed on June 24, 2016, claiming priority to an application filed on October 20, 2014; the '454 patent issued on May 9, 2017, with ten (10) claims.

10                    HPI V. KROGER COMPLAINT

60.     Claim 1, like every claim of the '454 patent, is directed to "[a]n apparatus comprising: three support sides, each support side comprising a back support and an edge support, wherein a top of each back support is in physical communication with an adjacent edge support clockwise about a central axis and each back support and each edge support is in physical communication with two ends of a solid interior" where the plane of each back support is at a particular angle to a specified "virtual plane," providing three specified "viewing angles," and "wherein each back support, each edge support, and each end is a surface of the solid interior [and] the solid interior is a pillow covered in fabric."

61.     A true and correct copy of the '454 patent is attached as **Exhibit A**.

62.     U.S. Patent No. RE48,479 ("the '479 patent") is a reissue of the '454 patent that issued on March 23, 2021.

63.     The '479 patent has the same figures and descriptions as the '454 patent and includes the same ten (10) claims as the '454 patent, as well as nineteen (19) additional claims.

64.     Claim 12 of the '479 patent, for example, is directed to a "media support apparatus comprising: a body having a first support back, a second support back, and a third support back disposed about a central axis" where each support edge is "disposed between" two support backs, wherein "the media support apparatus is configured to be rotated about the central axis so that the body can rest on a horizontal support in any one of three positions …" and provides three "viewing angles" that are different from one another.

65.     A true and correct copy of the '479 patent is attached as **Exhibit B**.

66.     HPI is the owner under applicable law and by assignment of all right, title, and interest in the '454 and '479 patents, including the rights to sue, recover damages and obtain equitable relief for the patents' infringement.

**JULIETTE AND BRUCE DESIGN AND DEVELOP FLIPPY**

67.     Juliette Fassett and her husband Bruce Cannon co-invented the patented "multiple viewing angle media support" disclosed and claimed in the '454 and '479 patents.

68.     Juliette Fassett is a repeat entrepreneur who has founded multiple businesses since she was in her 20s.  Her interest in consumer products was honed by her having lived and worked in Japan and experiencing its cultural focus on excellence in design and attention to detail.  In particular, while working at Toyota Chuo Kenkyuusho (Toyota's think-tank), Juliette came to understand the concept of "*ii kanji*"—which is defined as something like "good function or feeling" and further connotes the idea of exceeding expectations.

69.     Juliette's husband and co-inventor, Bruce Cannon, is an optical engineer and scientist with 35 years of experience designing optical systems—primarily sighting equipment for military applications, but also for consumer products.  One notable contribution is Bruce's thermal imaging work on the FLIR Star SAFIRE, which is a gyro-stabilized electro-optical infrared system most often used in airborne, land, and maritime force protection and medevac operations.  This system was famously instrumental in the capturing of Boston Marathon bomber Dzhokar Tsarnaev by Massachusetts State Police in 2013.

70.     Juliette and Bruce are the named co-inventors on the Flippy patents, and between them, are the named inventors on 13 patents.

71.     Circa 2011, there were very few tablet stands that could hold a tablet or iPad in a perfect reading position both comfortably and without the user's assistance. Most of the available tablet stands were made of hard metal and/or plastic and required support from the user.

72.     So Juliette spent 2 years researching, thinking, drawing, examining, messing with, building and taking apart tablet stands.  She formulated many ideas about what she thought would work and what was missing in the marketplace.

73.     With Bruce's input, they were able to realize their concept of a soft but supportive stand that would provide multiple reading angles—appropriate for multiple positions such as sitting, standing, and lying down—with a flip of the wrists.

74.     Juliette and Bruce had CAD drawings for the Flippy as part of the design and development process.

75.    In particular, the geometry and trigonometry of the Flippy is something that Juliette and Bruce worked on for 18 months before settling on the design.  The optical angles for viewing (the trigonometry part) needed to achieve appropriate depth-of-focus and take into account brightness degradation and eye relief—all while meshing perfectly with the support aspect of having the Flippy on the viewer's body (the geometry part) because one primary use is for when the viewer is lying down (e.g., in bed or on the couch).

76.    Juliette and Bruce filed their provisional patent application on Flippy in 2013, and their initial patent issued in 2017.

77.    The Flippy has three support sides, each comprising a back support and an edge support, wherein a top of each back support is in physical communication with an adjacent edge support, and each support edge is "disposed between" two support backs—as variously recited in claims of the '454 and '479 patent claims.

78.    The claims of the '454 and '479 patents do not, however, specify how any back support is "in physical communication with" any edge support, or how any support edge is "disposed between" two back supports.

79.    The Flippy is and always has been characterized by rounded bumper-like shapes between each back support and the next edge support, as shown in the image below.

HPI V. KROGER COMPLAINT



80.     Juliette knew that her Flippy had to have a certain "*ii kanji*," so she specifically included these rounded ledges for the lip of the media support in her design for the otherwise prism-like device, which evoke waves rolling onto a beach.



81.     Juliette has always viewed these rounded ledges as a signature aesthetic feature of her design.  Without them, the Flippy would have the same functionality and satisfy the claims of the '479 patent, but would appear weapon-like; it would look like a "ninja star" or shuriken when viewed from the side, as above, which would not reflect the proper "*ii kanji*" of the product she sought to create.

82.     Throughout the design iteration process and manufacturing of Flippy, Juliette insisted on maintaining these signature rounded ledges to her precise personal standards of roundedness to produce the right "*ii kanji*" for Flippy

83.     Even back from the earliest days of designing what would become the Flippy in November 2011, Juliette remarked that one proposed product design was "just to[o] sharp" and that she and Bruce "ha[d] to go back to rounding the design."  When viewing a revised design two days later, Juliette again remarked that "we need to round out the [l]edges much, much more."

84.      Juliette refused to compromise on her standards of roundedness for the rounded ledges throughout the product lifecycle, including during manufacturing.

85.     As another example of her commitment to Flippy's "*ii kanji*," Juliette spent months working on indentation force deflection alone in order to determine the optimal foam to use for Flippy.

86.     Overall, each design element of the Flippy product was the result of an exhaustive process of iteration and research on design and material decisions informed by Juliette's and Bruce's decades of experience.

87.     Juliette was determined to create the perfect multi-angle tablet stand and was meticulous in her process of developing Flippy.  The only corners she cut were literal—to form Flippy's signature rounded ledges.

88.     The distinct look and shape of the Flippy design is shown below in its emblematic format, for which the USPTO award HPI registered trademark No. 7,437,967 in 2024.



89.    Juliette's development of Flippy also leveraged her keen sense of style and appreciation for marketing—calling it "Flipy" (and then "Flippy") to emphasize that the multiple angles are provided by flipping the product around its horizontal axis.

90.    Juliette then sought to register trademarks for Flipy and Flippy in order to further protect the brand that she had spent so much time and effort to develop.

## HPI'S FOUNDING AND BUSINESS

91.    Juliette founded HPI in September 2018 to attract investment to support burgeoning sales of Flippy directly to consumers through various channels.

92.    Based on large purchase orders from QVC, which were based on market tests, Juliette took private investment and formed HPI as a Delaware-registered C Corporation, issuing shares to investors.

93.    This private investment lowered the cost of capital for Juliette and HPI by making it unnecessary to seek traditional purchase order financing (at a higher cost) to fund production of the Flippy units for the QVC purchase order.

94.    Through HPI, Juliette was committed to providing a quality product from a socially conscientious business platform:  HPI was and is a nationally-registered WBENC (Women's Business Enterprise National Council) business and HPI supported its literacy partner www.firstbook.org through product sales and also helped employ developmentally challenged adults through warehouse operations.

HPI V. KROGER COMPLAINT

95.    In November of 2018, Flippy sold out on QVC in a single airing: $500,000 worth of product in 12.5 minutes.  The product was a hit.  HPI's revenues in 2019 totaled $7,000,000—all from sales of Flippy.

96.    Since selling out on QVC, HPI has offered for sale and sold the Flippy continuously, including on Amazon, Etsy, Grommet, and direct-to-consumer on its own website, getflippy.com .

97.    As shown in the annotated image below, the '454 patent was at all relevant times clearly marked on a tag attached to the Flippy product itself:



98.    As shown in the annotated image below, the '454 patent was at all relevant times also clearly marked on the packaging for the Flippy product:

HPI V. KROGER COMPLAINT



99.    All product and packaging for Flippy that were manufactured after issuance of the '479 patent were marked with the '479 patent, as were all subsequent orders thereafter by HPI of Flippy product and packaging.

**ONTEL AND TELEBRANDS PERSONNEL ORDER MULTIPLE FLIPPY PRODUCTS**

100.    Prior to its television debut and rapid sell-out on QVC, Flippy sold well on Amazon, showing up as a hot product thanks in large part to an overwhelming number of five-star reviews.

101.    On information and belief, Ontel was monitoring Amazon for popular and/or innovative products.

102.    On information and belief, at least one Ontel product development employee at the time noticed the sales and positive reviews of Flippy and decided to investigate further.

103.    On October 1, 2018, an order was placed with Amazon for a grey Flippy for delivery to Ontel's corporate address (21 Law Drive, Fairfield, NJ 07004).

104.    On information and belief, this Flippy was actually delivered to Ontel's corporate address.

HPI V. KROGER COMPLAINT

105.    This Flippy was marked (on both the product and the packaging) as patented under the '454 patent.

106.    About a month later, on November 3, 2018, HPI's Flippy was featured on QVC and HPI sold its entire inventory of product—over 15,000 units—in under 13 minutes, earning over $500,000 in sales revenues.

107.    That same day, Flippy sales on Amazon did another $40,000 in sales, as some potential customers who could not purchase on QVC immediately sought out the Flippy for purchase.

108.    In one day, Flippy had sold more than its three prior years combined.

109.    This tsunami of consumer demand was the sort of data that indicated that substantial sales might justify the marketing and manufacturing of knock-off products.

110.    Shortly after the QVC sellout, beginning on November 15, 2018, Ontel employee Lorraine Addice placed multiple orders via Amazon for delivery of another twenty-six (26) Flippy products (comprising multiple quantities of each of the grey, charcoal, dark blue, and burgundy colors) to Ontel's corporate address (21 Law Drive, Fairfield, NJ 07004).

111.    On information and belief, each of these Flippys was actually delivered to Ontel's corporate address.

112.    Each of these Flippys was marked (on both the product and the packaging) as patented under the '454 patent.

113.    While most of these products were addressed for delivery to Ontel employee Carly Buonocore, these orders also included a grey Flippy that was ordered on November 20, 2018 for delivery to Ontel's Vice President Karen How-Lebrenz.

**ONTEL PROVIDES A KNOCK-OFF PRODUCT CALLED PILLOW PAD**

114.    On information and belief, as of 2019, Ontel had entered into agreements with each of numerous retailers, including Defendant, pertaining to their purchase, distribution and/or sale of one or more Ontel products.

115.    On information and belief, throughout 2019, Ontel arranged with numerous retailers for their purchase, distribution and/or sale of its knock-off Pillow Pad product.

116.    On information and belief, based on the response to Ontel's initial television advertising in February 2019, Ontel subsequently arranged for a knock-off product to be made, consistent with its historical business model of testing the market and only arranging for knock-off products to be manufactured if sufficient sales interest could be generated.

117.    As shown in the attached Exhibit C, the Pillow Pad infringes at least claim 1 of the '454 patent, at least under the doctrine of equivalents.

118.    On information and belief, Ontel directly copied both the functional and design elements of the Flippy products that it ordered.

119.    Given that the Flippy products delivered to Ontel in late 2018 included grey, blue, and burgundy Flippys, it was no coincidence that the Pillow Pad was offered in substantially similar (if not identical) grey, blue, and burgundy colors:



https://www.youtube.com/watch?v=RrdibdsDLYw

120.    On information and belief, at least initially, Ontel did not offer its Pillow Pad product in any colors other than those in which the Flippy was available.

121.    On information and belief, Ontel's Pillow Pad product has been made in and imported from China beginning in late 2018 and/or early 2019.

122.    Ontel's Pillow Pad product was (and continues to be) priced more cheaply than Flippy, and its initial pricing was intended to drastically undercut Flippy's pricing.

123.    Flippy's pricing was based in part of its use of high-end materials specifically and meticulously selected by Juliette to convey the right "*ii kanji*."  In contrast, Ontel's knock-off Pillow Pad product was of vastly inferior quality, which allowed for its drastically lower price.

124.    Numerous reviews have remarked on the very light weight and flimsy feel of the Pillow Pad product, and the poor quality of the materials for the pad cover and the zipper.

125.    These include a video review from the "Freakin' Reviews" account on YouTube, which noted that most positive reviews of the Pillow Pad were submitted by Ontel or persons at Ontel, and demonstrated the "cheap design" of the Pillow Pad at



https://www.youtube.com/watch?v=b4eMvA0s8zE .

126.    A number of comments posted to the "Freakin' Reviews" video review of Ontel's knock-off Pillow Pad product specifically noted its inferior quality as compared to the Flippy. These include the following comments:



"problem is the 'pillow pad' is a ripoff of the Flippy and if you look at the reviews it's [*sic.*] quality is poorer and the original which makes sense since it's a ripoff and cheaper.."



"I bought a flippy 2+ years ago, and at that time it was only one of it's kind [*sic.*] on Amazon and $50. . . . I do think the flippy is a lot firmer than the pillow pad, and perhaps heavier."



"I'm between this [Pillow Pad] and the Flippy, but Flippy has better reviews on Amazon and looks way better. I think I'll pay $5 for a better made pillow.  Flippy also looks better on videos."

127.    Numerous Amazon reviews of Ontel's Pillow Pad product also criticized its inferior quality as compared to Flippy.  For example:



babs494
⭐☆☆☆☆  **Would not recommend**
Reviewed in the United States on December 30, 2023
Color: Blue | Style: Ultra | Verified Purchase
I bought this for my husband. It came earlier today. It was squished into a box that was about maybe 4 inches in each side like a square tube. Once opened, it was not recognizable as compared to illustration on line. We followed instructions allowing it to sit for a few hours. Nothing. We put in the dryer with a damp dish cloth. Still could not make it look like it should. It was unusable. I am returning it. And will have to pay more for a Flippy or look locally for one that actually looks and functions as a tablet pillow.

"I bought this for my husband.  It came earlier today. . . . Once opened, it was not recognizable as compared to illustration on line. . . . It was unusable.  I am returning it.  And will have to pay more for a Flippy or look locally for one that actually looks and functions as a tablet pillow."



Johnboy
⭐☆☆☆☆  **Wrinkled Floppy Poor Excuse for an iPad type support pillow!**
Reviewed in the United States on December 18, 2023
Color: Blue | Style: Ultra
I have a Flippy brand iPad pillow. It's a great product but it's a little pricey so I purchased this product for a second room. This is a piece of junk. Please just don't buy one. I returned it the next day. Amazon said it's a "frequently returned item. Haha. That should tell you all you need to know about it.

"I have a Flippy brand iPad pillow.  It's a great product but it's a little pricey so I purchased this product for a second room.  This is a piece of junk.  Please just don't buy one.  I returned it the

next day.  Amazon says it's a 'frequently returned item. Haha.  That should tell you all you need to know about it."



"I had previously had a flippy which I loved.  I was shocked when this one came to my door and was rolled up and shoved in a plastic tube holder.  I took it out as it said to do and let it sit out for five hours, and it still look like it was just taken out of the tube.  So I shoved it back in and I'm returning it.  I will have to pay more for a real flippy, but I'm willing to do it."



"This is no where near as good as a flipy.  I actually feel my search misled me to this one but live and learn. . . . I have a flipy and it's wayyyy more solid and easy to move around with the iPad on it. If not for my coardboard hack this would sorta cave under the weight when picked up with one hand . . . . Honestly not worth my time to return.  Trust my advice spend the extra 15 and get the real one."



"This pillow came rolled up tight in a skinny little box.. many days ago.. it still hasn't recovered. It's a little lopsided and badly wrinkled.  It's hollow in the middle and the foam is split on one side.  I bought it because it cost less that the Flippy brand pillow and they made it look nice like the Flippy in the listing.  Since then, I bought a real Flippy tablet pillow and it didn't come rolled and squashed and is very nice quality."

128.     After receiving emails from HPI's CEO in March and April 2019, without any license from HPI, Ontel continued and/or began to develop, import, advertise, distribute, offer for sale, and sell its Pillow Pad products, through its various retail partners, including Defendant.[2]

---

[2] On May 10, 2019, Ontel first used the name "Pillow Pad" in commerce.

129.    Following the issuance of the '479 patent in March 2021, Ontel's knock-off Pillow Pad product has been sold primarily by retailers and other third parties.

130.    On information and belief, Ontel agreed to indemnify many of the retailers who sold and/or are selling the knock-off Pillow Pad product against certain claims of patent and/or other intellectual property infringement.

### DEFENDANT'S KNOWLEDGE OF HPI'S PATENTS

131.    Flippy was marked, on the product itself and its packaging, with the '454 patent and/or the '479 patent at all relevant times.

132.    On or about September 5, 2019, Juliette sent correspondence to Kroger principals, including CEO W. Rodney McMullen, VP of Merchandising Valerie Jabbar, General Counsel Christine Wheatley, and VP and Chief Ethics and Compliance Officer Martha Sarra, informing them of their infringement of HPI's intellectual property via Kroger's provision of Ontel's knock-off Pillow Pad product.

133.    In that correspondence, Juliette also invited Kroger to work with her to find a mutually beneficial solution, requested to come present her innovative Flippy product to Kroger, and asked that Kroger remove Ontel's knock-off Pillow Pad product from its shelves and cancel any existing purchase orders.

134.    Approximately two weeks later on September 17, 2019, J. Mark Wilkinson, a senior in-house attorney at Kroger who testified in January 2018 in the Zuru v. Telebrands that he "speak[s] directly to the general counsel on IP matters," responded to Juliette via email.

135.    During that January 2018 testimony, Mr. Wilkinson also stated that Kroger does not do any independent investigation as to the non-infringement of a vendor's products sold in Kroger's stores.  Instead, according to Mr. Wilkinson, Kroger relies up on its standard vendor agreement, which (among other things), requires the vendor to indemnify Kroger for any liability for IP infringement.  Mr. Wilkinson also testified that it was "fair enough" to characterize

Kroger's approach to infringement diligence as being "[a]s long as the vendor represents to [Kroger] it's clear, green light, it's full steam ahead" as far as Kroger is concerned.

136.    In that email response to Juliet, Mr. Wilkinson claimed that "Kroger respects IP rights of others" and informed Juliette that Kroger had tendered Juliette's "claim to Ontel Products for handling and response . . . consistent with Kroger's standard practice of not resolving disputes between vendors or potential vendors." Mr. Wilkinson closed by conveying his view that "using a cease and desist letter with allegations of patent infringement in hopes of becoming a vendor to Kroger is not a tactic that is well received by Kroger or its merchandising team."

137.    On information and belief, following its receipt of Juliette's September 5, 2019 correspondence. Kroger did not alter its practices involving sales and offers for sale of Ontel's knock-off Pillow Pad product, nor did Kroger's commercial relationship with Ontel change.

138.    On September 17, Juliette replied to Mr. Wilkinson's email, inquiring whether Kroger's referring her claim to Ontel and non-involvement in such disputes abdicated Kroger of responsibility. Juliette shared her confusion about how her letter advising Kroger of Ontel's IP theft, coupled with supporting evidence and a suggested solution, would not be well-received by Kroger when Kroger claimed to respect the IP rights of others. Juliette closed by expressing her disappointment that she did not receive a "more supporting and thoughtful response" and stating that she read Mr. Wilkinson's email as telling her to go away.

139.    Nevertheless, Juliette replied later that morning, disputing Mr. Wilkinson's characterization of her prior correspondence requesting some concern about her IP and seeking the opportunity to show Kroger the actual and original product that Ontel was ripping off. Juliette reiterated her position that Kroger was unlawfully making money selling a product that she created and patented by stating "if you weren't buying this product then we wouldn't be having this conversation would we?". Juliette closed by indicating that she would not be contacting Mr. Wilkinson further.

140.    Mr. Wilkinson did not further respond.

141.    Mr. Wilkinson responded the following morning, September 18, 2019, in an email addressed to Juliette's counsel and cc-ing Juliette.  Mr. Wilkinson reiterated his prior assertions, and denied that Kroger's policies abdicated Kroger of responsibility when Kroger declined to "'play judge and jury' for an IP dispute that should be handled" between HPI and Ontel based on its agreement with Ontel.  Mr. Wilkinson also refused to provide any further comment regarding Juliette's disappointment in not receiving a "supporting and thoughtful response," instead reiterating that it was a "strategy" that was not well-received.  Mr. Wilkinson closed by requesting that any future communication on this issue come from Juliette's counsel, confirming Juliette's previously-expressed view that she was being told to go away.

142.    On May 27, 2021, Juliette again wrote to Kroger CEO W. Rodney McMullen, after seeing his presentation at the "Inclusive Capitalism in Action: Lessons from the Cincinnati Region" event.  Juliette expressed her appreciation of Kroger's sincere efforts to do good in the world and her "being absolutely gobsmacked by Kroger's breathtaking, and stupefying, corporate hypocrisy" as illustrated by its cavalier approach to innovators' IP rights.  Juliette referenced her 2019 correspondence, and expressed her incredulity at Kroger's touting partnerships with WBENC businesses and its "Diversity, Equity and Inclusion Framework for action" while simultaneously refusing to address its own complicity with helping Ontel rip off the innovative product created by a small woman-owned business.

143.    On June 6, 2023, Kroger was again put on notice of its infringement through its sales and offers for sale of Ontel's knock-off Pillow Pad product via correspondence from HPI's outside counsel explicitly referencing the '479 patent and including a claim chart and evidence of offers for sale from the website of Kroger and most of its various sub-brands.  Among other things, this letter demanded that Kroger immediately cease and desist its infringing sales and offers for sale of Ontel's knock-off Pillow Pad product.

144.    That same day, Mr. Wilkinson responded via email, referencing the earlier strings of correspondence with Juliette and reiterating that Kroger would tender the matter to Ontel. HPI.

145.    HPI's outside counsel acknowledged receipt of Mr. Wilkinson's response the following morning, requesting that Mr. Wilkinson confirm when Kroger has completed its diligence.

146.    On June 12, 2023, Mr. Wilkinson provided that response, claiming that Kroger did not sell any products that violated the claims of the '479 patent.

147.    On information and belief, consistent with the statements that Mr. Wilkinson provided in his prior correspondence to Juliette and in his 2018 testimony, Kroger's "diligence" was simply relying on Ontel's say-so that there was no infringement of the '479 patent.  On information and belief, based on Mr. Wilkinson's prior testimony and statements to Juliette, Kroger performed no independent diligence to assess whether or not Ontel's knock-off Pillow Pad product infringed any claims of the '479 patent.

148.    Mr. Wilkinson also disingenuously "noted that the alleged infringing product being sold by Kroger was manufactured prior to the issuance of the RE '479 patent."  However, as a patent attorney, Mr. Wilkinson almost certainly was aware—and certainly should have been aware—that the date of Ontel's manufacture of any of the knock-off Pillow Pad products provided to Kroger was irrelevant to whether Kroger's sale or offer for sale of those products after the issuance of the '479 patent constituted infringement.

149.    Mr. Wilkinson closed his response by suggesting that HPI reach out directly to Ontel, the vendor of those products to Kroger.

### ONTEL BLOCKS HPI OUT OF RETAIL, AND DEFENDANT AND OTHER RETAILERS INSTEAD SELL ONTEL'S KNOCK-OFF PILLOW PAD PRODUCT

150.    On the basis of the QVC sellout, Juliette reached out to the buyer at Bed, Bath and Beyond ("BBB") in January 2019 in an effort to place Flippy in BBB retail channels.  Juliette explained that the Flippy product was patented, had sold out on QVC, and enjoyed consistent 5-star reviews.  Juliette also shared that HPI had a highly experienced team and financing in place, and was ready to add retail partners.

151.    BBB's buyer, Greg Rosenthal, responded tersely via email, stating "we would not bring in that product."

152.    When Juliette followed up, asking if there were other buyers at BBB who would be more appropriate, Greg Rosenthal confirmed "[N]o, this would fall in my area."

153.    On information and belief, BBB had an ongoing relationship with Ontel and had served as a retail outlet for a number of "As Seen on TV" products supplied by Ontel.

154.    BBB was another prominent company based in northern New Jersey, with its headquarters in Union, a mere 20 miles or so away from the Fairfield headquarters of Ontel and Telebrands.

155.    In less than 6 months after stating that "we would not bring in that product" to Juliette, the knock-off Pillow Pad product supplied by Ontel was, on information and belief, in Bed, Bath and Beyond stores across the USA.

156.    A picture of Ontel's knock-off Pillow Pad product on the shelves at a BBB retail location on or about July 19, 2019, is shown below:



157.    Ontel's knock-off Pillow Pad product was a multi-year retail success for BBB. Even as BBB was closing, the PillowPad was one of the last products still sold in stores and online.

158.    The experience with BBB is illustrative of how the growth trajectory for HPI—especially through the retail sales channel—was quickly eclipsed by the immediate launch of the knock-off PillowPad product, consistent with Ontel's knock-off business model.

159.    On information and belief, at that time Ontel had similar arrangements and similar plans in the works with a number of other retailers, including but not limited to Walmart and Defendant, based on their previous commercial relationships.

160.    Ontel's knock-off Pillow Pad product began to show up on retail shelves across the nation in or around July 2019.  At this time, Juliette Fassett personally found Ontel's knock-off Pillow Pad product being sold at BBB and in Walmart retail locations.

HPI V. KROGER COMPLAINT

161.    In September 2019, Juliette Fassett found Ontel's knock-off Pillow Pad product for sale at her local Kroger store, Fred Meyer.  A number of Juliette's friends, familiar with Flippy, contacted her with congratulatory messages that they were pleased to see "Flippy" being sold on the shelves.

162.    Even these friends—who were familiar with Juliette and her years of developing Flippy, and at least some of whom had actual Flippy tablet stands—were confused about the source of Ontel's knock-off Pillow Pad product that they saw on the shelves at Fred Meyer, conflating it with HPI's innovative Flippy.

163.    Even when Josh Malone, the inventor of Bunch O Balloons, posted on his LinkedIn page about Ontel (and Walmart) knocking off Juliette's innovative Flippy tablet stand, one of the commenters congratulated Juliette for a great idea after having seen what he thought was her original Flippy product on the shelves at Fred Meyer—when it was actually Ontel's knock-off Pillow Pad product that was being sold and offered for sale at Fred Meyer.





164.    On December 29, 2019, Juliette received an email from an irate Fred Meyer customer who purchased Ontel's knock-off Pillow Pad product.  This customer reached out to Juliette and was seeking compensation for the fact that that her red "Flippy" bled on her new white duvet.  Juliette responded, explaining that what was purchased was not Flippy but rather Ontel's knock-off Pillow Pad product, and that this customer should reach out to Kroger and Ontel instead.

165.    By the end of 2019, Ontel's knock-off Pillow Pad product was in another of other retail locations including at least JOANN, Target, Walmart, Big Lots, Lowe's, BBB, Meijer, Boscov's, and BJ's Wholesale Club.

166.    Ontel's knock-off Pillow Pad product was also being sold online from a number of these retailers' respective websites (including those of BBB, Target, Walmart, and various retail brands owned by Defendant), as well as Amazon and the direct-sales website(s) that Ontel had created for its knock-off Pillow Pad product.

167.    In addition to being blocked from expanding into retail channels because Ontel's knock-off Pillow Pad product was so quickly ensconced across the channel, HPI's successful Amazon and QVC sales channels soon faltered.

168.    On November 22, 2019, Juliette received a return notification from Amazon from a Flippy customer, who indicated that "There is an item almost identical to this being sold at Lowes for $15 cheaper."  On information and belief, Lowe's was at least offering for sale Ontel's knock-off Pillow Pad product as of that date.

169. On New Year's Eve, December 31, 2019, the QVC buyer sent Juliette an email with a photo of the knock-off PillowPad being sold at a Walmart location in Boothwyn, PA:[3]



170. The QVC buyer's email stated:

> Hi Juliette,
>
> Stumbled upon this at Walmart. Is this the competitor we've been discussing for the last year now? Can you update us on the legal standings?
>
> Thanks

171. On information and belief, Defendant's pricing for Ontel's knock-off Pillow Pad product was similar to that of Lowe's at that time.

172. That saturation of retail channels by Ontel's inferior quality and lower-priced Pillow Pad product was the beginning of Flippy's demise. As Ontel's knock-off Pillow Pad product advertised head-to-head with Flippy on Amazon and also sold widely in a variety of retail channels, sales of Ontel's knock-off Pillow Pad eclipsed those of Flippy, and consumers who purchased Ontel's knock-off Pillow Pad continued to confuse and conflate it with Flippy.

173. Even in response to a Facebook post on Flippy's page in September of 2020, a number of people responded with comments indicating that they had actually purchased a Pillow

---

[3] Defendant Walmart was thus offering for sale and selling Ontel's knock-off Pillow Pad product in at least physical retail locations as of no later than that date.

Pad instead, such as Linda Zary, who thought that she purchased a Flippy at Walmart—which never stocked Flippy, and instead had (and still serves as a seller of) Ontel's knock-off Pillow Pad product:



174.    Two other people commented in response, each that theirs is "called pillow pad," demonstrating actual confusion of Ontel's knock-off with HPI's high-quality innovative product:



175.    Ontel's knock-off product, price-undercutting efforts, and deliberately confusing advertising blocked the forward trajectory of Flippy, destroying the market and freezing any potential monetization of HPI's innovation.  HPI's QVC sales immediately tanked and its Amazon sales softened as Ontel undercut HPI with a cheap, inferior-quality knock-off product that saturated the category in every sales channel.

176.    Flippy sales suffered tremendously:  From 2018 sales of $682,000 and 2019 sales of over $6.9 million, Flippy's 2020 sales decreased to $4.3 million, and they continued to decline to $3.277 million in 2021, $1.5 million in 2022, and $1.0 million in 2023 as Ontel's knock-off

Pillow Pad product remained for sale in retail locations, including on information and belief those of Defendant, at prices calculated to undercut HPI's sales.

177.    At least as of May 27, 2023, Kroger was continuing to sell and offer for sale, at least online, Ontel's knock-off Pillow pad product via its Kroger.com website as evidenced by the screenshot below taken on that date:



178.    At least as of May 27, 2023, Kroger was continuing to sell and offer for sale, via its Ralph's brand, at least online, Ontel's knock-off Pillow pad product via its Ralphs.com website as evidenced by the screenshot below taken on that date:



179.    At least as of June 1, 2023, Kroger was continuing to sell and offer for sale Ontel's knock-off Pillow pad product, via its Baker's, City Market, Dillons, Food4Less, Foods Co., Fred Meyer, Fry's, Gerbes, Harris Teeter, JayC, King Soopers, Mariano's, Metro Market, Pay Less Supermarkets, Pick 'n Save, QFC, and Smith's Food and Drug brands, at least online, via their respective websites as evidenced by the screenshots below taken on that date:





HPI V. KROGER COMPLAINT



HPI V. KROGER COMPLAINT



HPI V. KROGER COMPLAINT





180.     As of January 29, 2025, Kroger continues to list and at least offer for sale Ontel's knock-off Pillow Pad Product via Kroger.com[4] and the websites of its various sub-brands, including Baker's,[5] City Market,[6] Dillons,[7] Food4Less,[8] Foods Co.,[9] Fred Meyer,[10] Fry's,[11]

---

[4] https://www.kroger.com/p/pillow-pad/0073554180427, last accessed Jan. 29, 2025.
[5] https://www.bakersplus.com/p/pillow-pad/0073554180427, last accessed Jan. 29, 2025.
[6] https://www.citymarket.com/p/pillow-pad/0073554180427, last accessed Jan. 29, 2025.
[7] https://www.dillons.com/ p/pillow-pad/0073554180427, last accessed Jan. 29, 2025.
[8] https://www.food4less.com/ p/pillow-pad/0073554180427, last accessed Jan. 29, 2025.
[9] https://www.foodsco.net/p/pillow-pad/0073554180427, last accessed Jan. 29, 2025.
[10] https://www.fredmeyer.com/p/pillow-pad/0073554180427, last accessed Jan. 29, 2025.
[11] https://www.frysfood.com/ p/pillow-pad/0073554180427, last accessed Jan. 29, 2025.

Gerbes,[12] Harris Teeter,[13] JayC,[14] King Soopers,[15] Mariano's,[16] Metro Market,[17] Pay Less Supermarkets,[18] Pick 'n Save,[19] QFC,[20] Ralph's,[21] and Smith's Food and Drug.[22]

181.    As an example of HPI's declining sales and price erosion due to Ontel's knock-off Pillow Pad product, Ollie's made Juliette an initial low-ball offer of $3/unit in October 2023 in response to September 27, 2023 email correspondence from Juliette.

182.    Ollie's buyer, Jonathan Lampert, elaborated on the rationale behind the low-ball offer in an email sent to Juliette on October 13, 2023: "I know this is <u>way</u> below your cost/handling/etc.  Unfortunately, the price bar was set very low with the excess we bought before.  $3.00 is actually double what we paid them."

183.    On information and belief, Mr. Lampert's use of "the excess we bought before" and "what we paid them" referred to Ontel and its knock-off Pillow Pad products.[23]

184.    After making substantial progress on a purchase agreement through early December 2023, and sending HPI a purchase agreement on December 5, 2023, Ollie's ultimately declined to take a license or purchase the Flippy from HPI just one week later.

185.    Ollie's corporate counsel conveyed that Ollie's was unwilling to agree to: cease selling Ontel's knock-off Pillow Pad product, provide its total purchases of the knock-off Pillow Pad product from Ontel, and/or provide a copy of any purchase orders from Ontel, as HPI requested for a full release of infringement liability.

---

[12] https://www.gerbes.com/p/pillow-pad/0073554180427, last accessed Jan. 29, 2025.
[13] https://www.harristeeter.com/p/pillow-pad/0073554180427, last accessed Jan. 29, 2025.
[14] https://www.jaycfoods.com/p/pillow-pad/0073554180427, last accessed Jan. 29, 2025.
[15] https://www.kingsoopers.com/p/pillow-pad/0073554180427, last accessed Jan. 29, 2025.
[16] https://www.marianos.com/p/pillow-pad/0073554180427, last accessed Jan. 29, 2025.
[17] https://www.metromarket.net/p/pillow-pad/0073554180427, last accessed Jan. 29, 2025.
[18] https://www.pay-less.com/p/pillow-pad/0073554180427, last accessed Jan. 29, 2025.
[19] https://www.picknsave.com/p/pillow-pad/0073554180427, last accessed Jan. 29, 2025.
[20] https://www.qfc.com/p/pillow-pad/0073554180427, last accessed Jan. 29, 2025.
[21] https://www.ralphs.com/p/pillow-pad/0073554180427, last accessed Jan. 29, 2025.
[22]  https://www.smithsfoodanddrug.com/p/pillow-pad/0073554180427, last accessed Jan. 29, 2025.
[23] On information and belief, Ollie's was offering for sale and selling Ontel's knock-off Pillow Pad products from its physical retail locations at least as of May 2023.

186.    But for Ontel's provision and advertising of its knock-off Pillow Pad product, including through its retail partners including but not limited to Defendant, HPI was ready and poised to move into retailers and their physical and online sales channels, including those of Defendant.  Even beyond Juliette's own decades of experience as a wholesale product developer and seller who has been selling into retail channels her entire career, HPI was set up with connected and experienced partners for warehousing, end-to-end logistics, and oversight for manufacturing in China.  HPI also had an experienced CFO and a network of investors and advisors who were ready and willing to assist with using the momentum from the QVC sellout to see HPI through to providing Flippy to physical retail locations.

### AMAZON REMOVES ONTEL'S KNOCK-OFF PILLOW PAD PRODUCT

187.    On April 1, 2021, HPI filed a complaint with Amazon's Utility Patent Neutral Evaluation ("UPNE") program in an effort to get Ontel's knock-off Pillow Pad product removed from Amazon's listings for infringing the '479 patent.[24]

188.    As shown in the attached Exhibit D, Ontel's knock-off Pillow pad product infringes at least claim 12 of the '479 patent

189.    On information and belief, Amazon provided notice of the UPNE process to Ontel in or about April 2021.

190.    In May 2021, Ontel declined to participate in the UPNE process, in which a neutral evaluator was to determine HPI's likelihood of proving that Ontel's Pillow Pad product infringed the '479 patent.

191.    On information and belief, Ontel declined to participate in the UPNE process because it had no real defense to HPI's infringement allegations, and wanted to avoid any record of contesting infringement and losing.

---

[24] At this time, UPNE was in the midst of a three-year beta testing period that began in 2019. UPNE officially concluded its beta version in 2022 when Amazon formally launched a substantially identical program that it branded as Amazon Patent Evaluation Express ("APEX").

192.    Following Ontel's non-participation in Amazon's UPNE and failure to file a declaratory judgment action against HPI, Ontel's knock-off Pillow Pad product was removed from the Amazon platform in June 2021.

193.    In response, Ontel created a substantially similar version of its knock-off Pillow Pad product—having only two rounded edges instead of the three rounded edges that the first knock-off version copied from Flippy—for sale on Amazon, Walmart.com, and on information and belief, through other retail channels.

194.    Nevertheless, the original version of Ontel's knock-off Pillow Pad product (having  three rounded ledges) continued and continues to appear in product listings on the websites of various other of Ontel's retail partners, including at least Walmart.com and the websites for Kroger and its various sub-brands, as set forth in paragraph 180 above, and its accompanying footnotes.

195.    Ontel has continued, and to this day continues, to distribute the Pillow Pad, including through its retail partners, on information and belief, including but not limited to Defendant.

196.    Defendant has offered for sale, and sold Ontel's knock-off Pillow Pad product.

197.    On information and belief, Defendant has also advertised Ontel's knock-off Pillow Pad product.

198.    On information and belief, Defendant continues to stock Ontel's knock-off Pillow Pad product and continues to advertise, list on its various websites, and/or offer for sale Ontel's knock-off Pillow Pad product.

## COUNT I

### (Direct Infringement of the '479 patent)

199.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

200.    Defendant has infringed under 35 U.S.C. § 271(a) at least claim 1 of the '479 patent under the doctrine of equivalents as of the issue date of the original '454 patent by selling and/or or offering for sale Accused Products (including the Pillow Pad and equivalent products) in the United States without license or authority.

201.    Defendant has infringed under 35 U.S.C. § 271(a) at least claim 12 of the '479 patent, as of the reissue date, by selling and/or or offering for sale Accused Products (including the Pillow Pad and equivalent products) in the United States without license or authority.

202.    The direct infringement of the '479 patent by Defendant has damaged Plaintiff by violating Plaintiff's right to exclude others from importing into and making, using, selling, and offering to sell covered products in the U.S.

203.    Defendant was on at least constructive notice of the '454 and '479 patents from the marking of the Flippy product and its packaging at all relevant times.

204.    Because the Pillow Pad meets each limitation of at least claim 12 of the '479 patent in the manner shown above and in Exhibit D, Defendant's infringement of the '479 patent has been willful at least as of its respective notice date of infringement, as set forth above, at which point that Defendant had actual knowledge of the '479 patent.

205.    Defendant knew or at the very least, should have known of the infringement of at least claim 12 of the '479 patent by its sales and offers for sale of Ontel's Pillow Pad product, and was willfully blind to the prospect of such infringement by, on information and belief, relying upon Ontel's assurances and indemnification instead of independently assessing the allegations of infringement.

206.    The actions of Defendant, including its low pricing of the Pillow Pad, have caused HPI to lose sales of the Flippy products with consequent loss of profits.

## COUNT II

### Trade Dress Infringement under the Lanham Act

207.    Plaintiff hereby re-alleges and incorporates by reference the foregoing allegations as if fully set forth herein.

208.    Plaintiff developed and has used the distinctive design of its Flippy media stand, including in particular its soft fabric cover and the rounded ledges between each back support and the next edge support, which are reflected in registered trademark No. 7,437,967 awarded by the USPTO to Plaintiff in 2024.  These distinctive features of the Flippy design can be seen above in paragraphs 79–84 and 87–88 and are referred to here as the Flippy Trade Dress.

209.    Plaintiff is the owner of all right and title to the Flippy Trade Dress.

210.    The Flippy Trade Dress and particularly the rounded ledges, at specific levels of roundedness, are distinctive of the Flippy.  The rounded ledges are not functional, as they are not essential to the use or purpose of the Flippy pillow, and do not affect the cost or quality of the item.

211.    The Flippy's distinctive rounded ledges also have acquired secondary meaning. Plaintiff has exclusively used this trade dress since 2013 (almost 6 years of exclusive use before Ontel came to market with the infringing Pillow Pad).  During that time, Plaintiff made significant sales and there were no other similar products on the market.  On information and belief, consumers came to associate this trade dress with the Flippy.

212.    Since Ontel's product came to market, there have been many instances of actual confusion where consumers bought Ontel's product, including from Defendant's Fred Meyer brand, believing it to be the Flippy, as evidenced by purchasers of the Ontel product complaining about it to Plaintiff HPI.

213.    On information and belief, Ontel copied the Flippy including the distinctive Trade Dress of HPI's Flippy in order to create a likelihood of confusion between the Pillow Pad and HPI's original Flippy, and continues to copy the distinctive Trade Dress of HPI's Flippy.

214.    Defendant's use of HPI's Trade Dress, in an attempt to advertise or promote sales of Ontel's knock-off Pillow Pad product, including through advertising materials, packaging, and products sold and offered for sale by Defendant, misrepresents the nature, characteristics, and quality of Ontel's products, said misrepresentation creating the likelihood that the public would associate Ontel's lower quality Pillow Pad in Defendant's retail channels with HPI and/or HPI's Flippy.

215.    On information and belief, Ontel's use of HPI's Trade Dress is and has been done in bad faith, knowingly and willfully and with the intent to confuse the relevant purchasing public.

216.    On information and belief, Defendant has failed to take any steps to prevent deception or confusion of the relevant purchasing public with respect to its marketing and sale of the infringing Pillow Pad products provided by Ontel.

217.    Defendant's unauthorized use of HPI's Trade Dress is an infringement in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

## COUNT III

### Texas Common Law Unfair Competition

218.    Plaintiff hereby re-alleges and incorporates by reference the foregoing allegations as if fully set forth herein.

219.    The acts of Defendant complained of herein constitute at least trade dress infringement, false designations of origin, dilution, and/or other unfair competition in violation of Texas common law.

220.    HPI has been and continues to be damaged by Defendant's conduct in an amount to be determined at trial.

221.    On information and belief, Defendant's conduct is willful, deliberate, intentional, and in bad faith.

222.    By reason of the foregoing acts, Defendant has caused, and unless enjoined by this Court, will continue to cause irreparable harm to Plaintiff for which Plaintiff has no adequate remedy at law.

## COUNT IV

**Injury to Business Reputation or Trade Dress under Texas Business and Commerce Code**

223.    Plaintiff hereby re-alleges and incorporates by reference the foregoing allegations as if fully set forth herein.

224.    Defendant's actions complained of herein is likely to cause injury to HPI's business reputation and to dilute the distinctive quality of the Flippy Trade Dress in violation of Tex. Bus. & Com. Code § 16.29, regardless of whether there is competition between the parties or confusion as to the source of goods or services.

225.    Defendant's acts complained of herein are likely to cause injury to HPI's business reputation and to dilute the distinctive quality of the Flippy Trade Dress, in violation of the Texas Anti-Dilution statute, Tex. Bus. & Com. Code § 16.103.

226.    Defendant's acts have caused injury to HPI's business reputation and dilution of the Flippy Trade Dress in violation of the Texas Injury to Business Reputation and the Texas Anti-Dilution Statutes.

## COUNT V

**Unjust Enrichment**

227.    Plaintiff hereby re-alleges and incorporates by reference the foregoing allegations as if fully set forth herein.

228.    Defendant has been and continues to be unjustly enriched at the expense of HPI by Defendant's actions complained of herein.

229.    Specifically, Defendant has taken unfair advantage of HPI by trading on and profiting from the good will and reputation of at least the Flippy Trade Dress, which was

developed and is owned by HPI, resulting in Defendant wrongfully obtaining a monetary and reputational benefit for its own business and the products it offers.

230.    The acts of Defendant complained of herein constitute unjust enrichment at HPI's expense in violation of Texas state common law.

231.    HPI has been damaged by Defendant's acts of unjust enrichment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff HPI respectfully requests that the Court enter judgment in favor of HPI and against Defendant as follows:

A.  Finding that Defendant has infringed the '479 patent;

B.  Requiring that Defendant renders a full and complete accounting to Plaintiff for each of its profits, gains, advantages or the value of business opportunities received from its respective sales of Ontel's Pillow Pad products;

C.  Requiring that Defendant pay Plaintiff damages sufficient to compensate Plaintiff for its respective infringements of the claims of the '479 patent, including lost profits suffered by Plaintiff as a result of its infringements and in an amount not less than a reasonably royalty;

D.  Finding that Flippy's signature rounded ledges constitute distinctive trade dress;

E.  Finding that Defendant has infringed Plaintiff's trade dress;

F.  For each violation of the Lanham Act, Defendant's profits pursuant to 15 U.S.C. § 1117(a);

G.  For each violation of the Lanham Act, Plaintiff's damages sustained pursuant to 15 U.S.C. § 1117(a);

H.  The costs of this action, pursuant to 15 U.S.C. § 1117(a);

I.  Pursuant to 15 U.S.C. § 1118, an order that all images, advertising, packaging, and products constituting or depicting the knock-off Pillow Pad product—whether instantiated in physical form, digital form, or other electronic format—with three rounded ledges in the possession of Defendant be delivered up and destroyed.

J.  Finding that Defendant has competed unfairly with Plaintiff.

K.  Awarding Plaintiff prejudgment interest, post-judgment interest, and costs; and

L.  Such other and further relief as the Court may deem appropriate.

**JURY DEMAND**

Plaintiff respectfully demands a trial by jury on all issues raised by this Complaint that are properly triable by a jury.


Dated: February 3, 2025

/s/ Chad Henson
Timothy Devlin
tdevlin@devlinlawfirm.com
Lowell D. Jacobson (*pro hac vice* forthcoming)
ljacobson@devlinlawfirm.com
Clifford Chad Henson (TX 24087711)
chenson@devlinlawfirm.com
**DEVLIN LAW FIRM LLC**
1526 Gilpin Avenue
Wilmington, Delaware 19806
Tel: (302) 449-9010
Fax: (302) 353-4251

*Attorneys for Plaintiff Happy Products, Inc.*